**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS
EAST SAINT LOUIS DIVISION**

| | | |
|---|---|---|
| DIANA EILEEN WISE, | ) | |
| individually and on behalf of all others | ) | |
| similarly situated, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | Case No. 3:14-cv-01426-SMY-DGW |
| | ) | |
| SLM CORPORATION, | ) | Judge: Staci M. Yandle |
| NAVIENT CORPORATION, and | ) | Magistrate Judge: Donald G. Wilkerson |
| NAVIENT SOLUTIONS, INC., f/k/a | ) | |
| SALLIE MAE, INC., | ) | *JURY TRIAL DEMANDED* |
| | ) | *EQUITABLE RELIEF SOUGHT* |
| *Defendants*. | ) | |
| _____ | ) | |

## CLASS ACTION COMPLAINT

Plaintiff, Diana Eileen Wise ("Plaintiff" or "Ms. Wise"), by her undersigned attorney, on her own behalf and on behalf of all others similarly situated, upon personal knowledge as to herself and her own acts, and upon information and belief as to all other matters, brings this action against Defendants SLM Corporation, Navient Corporation, and Navient Solutions, Inc., formerly known as Sallie Mae, Inc. ("collectively Defendants") and alleges as follows:

## NATURE OF THE ACTION

In an age of rising student loan debt, college graduates commonly attempt to avoid paying interest by paying off student loans early. For those who are financially able, making student loan payments in an amount greater than the minimum payment due, allows the student loan debtor to pay off student loans earlier than if only the scheduled monthly payment is made.

1

Paying off student loans early has both financial and emotional incentives. The emotional incentive is derived from the sense of fulfillment and accomplishment that naturally flows from paying back the money borrowed to obtain a higher education, as well as the sense of relief that flows from not having a crushing student loan payment each month. The financial incentive for students arises because of the interest accrual system utilized by most student loan servicers, who, like Defendants, utilize a loan repayment system where student loans accrue interest daily, based on the principal amount of the loan outstanding. Therefore, when student loan principal is paid off early, there is less principal to accrue interest on. As such, over the life of the loan, the student loan debtor will pay less interest as he or she decreases his or her principal.

Accordingly, many student loan debtors who make extra payments attempt to channel his or her extra payments to principal only, as this is the most efficient use of an extra payment. However, applying extra payments to principal only is also the most costly practice for student loan servicers, including Defendants. When student loan debtors decrease the principal amount of their loans more quickly than scheduled (i.e., by making extra payments to principal), the loan servicers make less money in accrued interest.

To prevent this loss of profit, Defendants routinely engage in unfair, deceptive, and illegal practices, as more fully described below. In short, Defendants have created a system designed to apply extra student loan payments in a way most beneficial to themselves and, often, in a manner directly opposite of that requested by the student loan debtor.

Further, after incorrectly applying an extra payment and receiving a request to apply payments correctly, Defendants "reverse" the payment in a manner that impermissibly re-categorizes accrued interest (which does not accrue further interest) as principal that does accrue interest.

Through this Complaint, Plaintiff seeks declaratory and injunctive relief, as well as compensation, on her own behalf and on behalf of a class of those similarly situated, for the violation of state and federal law, including but not limited to, the unfair, deceptive, and illegal acts and practices of Defendants. Some of Defendants' acts include, but are not limited to, the employment of a confusing and misleading payment application system, application of student loan payments in direct contravention to the student loan debtor's direction, and the reversal of misapplied payments in a manner that impermissibly shifts non-interest accruing interest back to interest-accruing principal.

Plaintiff and all others similarly situated have been damaged as a direct and proximate result of Defendants' willful and intentionally deceptive conduct, warranting punitive damages for Defendants' irreprehensible behavior and injunctive relief to prevent Defendants from continuing to disregard the payment instructions of struggling student loan debtors and punishing student loan debtors who insist on the correct application their extra student loan payments.

## THE PARTIES

1.      SLM Corporation is a publicly-traded Delaware corporation, trading on the NASDAQ stock exchange under ticker symbol "SLM." SLM Corporation's principal place of business is at 12061 Bluemont Way, Reston, Virginia. SLM Corporation may be served through its registered agent, Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, Delaware, 19808.

2.      Navient Corporation is a publicly-traded Delaware corporation, trading on the NASDAQ stock exchange under ticker symbol "NAVI." Navient Corporation's principal place of business is at 300 Continental Drive, Newark, Delaware, 19713. Navient Corporation may be served though its registered agent, Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, Delaware, 19808.

3.      Sallie Mae, Inc. was a subsidiary of SLM Corporation. Sallie Mae, Inc. is now known as Navient Solutions, Inc.

4.      Navient Solutions, Inc., formerly known as Sallie Mae, Inc., is a Delaware corporation with its principal place of business at 12061 Bluemont Way Reston, Virginia, 20190. Navient Solutions, Inc., may be served though its registered agent Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, Delaware, 19808.

5.      A principal-agent relationship exists between SLM Corporation, Sallie Mae, Inc., Navient Corporation, and Navient Solutions, Inc. SLM Corporation is the principal of all other related entities.

6.      SLM Corporation is liable for the wrongful acts of its subsidiary-agents.

7.      Navient Corporation is liable for the wrongful acts of its subsidiary-agents.

8.      Alternatively or additionally, the acts of the Defendants were conducted in concert pursuant to an express or implied agreement amongst themselves to act in this collective manner. All Defendants are therefore jointly and severally liable for the acts complained of herein.

9.      Plaintiff Diana Eileen Wise is, and at all times mentioned herein is believed to have been, an individual citizen of the State of Illinois. Ms. Wise resides in O'Fallon, Illinois.

## JURISDICTION AND VENUE

10.      This Court has federal question subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331.

11.      Further, this Court has subject matter jurisdiction over this class action pursuant to 28 U.S.C. 1332(d)(2) based on Plaintiff and Defendants minimal diversity of citizenship and an amount in controversy exceeding $5,000,000.

12.      This Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a).

4

13.     This Court has personal jurisdiction over the Defendants because Defendants regularly and systematically conduct business in this District, including, at minimum, entering into contracts in this District, collecting student loan payments from this District, and deliberately misapplying collected student loan payments from student loan debtors residing in this District.

14.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c) because Defendants have and continue to enter into contracts in this District and collect student loan payments from this District.

## FACTUAL ALLEGATIONS

### *The Rise of Student Loan Debt*

15.     Today, there is more than $1.2 trillion in outstanding student loan debt. http://www.forbes.com/sites/specialfeatures/2013/08/07/how-the-college-debt-is-crippling-students-parents-and-the-economy/

16.     Private student loans account for more than $150 billion of the $1.2 trillion figure. Exhibit A, Annual Report of the CFPB Student Loan Ombudsman, October 16, 2012, available at http://files.consumerfinance.gov/f/201210_cfpb_Student-Loan-Ombudsman-Annual-Report.pdf

17.     Student loans, and the upward socioeconomic ability they provide, are one of the greatest aspects of modern American society.

18.     Without student loans, millions of low and middle-income citizens would not have the opportunity to attend college and secure a better future themselves and their children.

19.     Student loans are the only type of consumer debt that has increased since the economic downturn of 2008. Student loan debt now exceeds both credit card debt and vehicle debt.

20.     Unlike most all other forms of debt, student loans cannot be discharged in bankruptcy.

21. Moreover, lenders, including Defendants, can garnish wages and Social Security benefits to collect student loan payments.

22. Total student loan debt has grown more than 150% since 2005, whereas over the same period overall prices rose just 22%.

23. According to TransUnion, in 2005 student loans accounted for less than 13% of the total debt load for adults age 20-29.

24. Today, student loans account for nearly 37% of that group's outstanding debt.

25. The Consumer Financial Protection Bureau's ("CFPB's") 2012 report on the private student loan industry noted that the student loan market could "significantly depress demand for mortgage credit and dampen consumption." Exh. A.

http://files.consumerfinance.gov/f/201210_cfpb_Student-Loan-Ombudsman-Annual-Report.pdf

26. Stated generally, students are so burdened with student loan debt, and in particular, high-interest private student loans, that many graduates have been prevented from purchasing a home or starting a family due to the crushing burden of twenty to thirty years of scheduled student loan payments, especially when those payments can be more than the amount of a modest mortgage payment.

*Student Loan "Servicers"*

27. Defendants are commonly known as student loan servicers.

28. Private student lending and servicing markets are highly concentrated.

29. Essentially, Defendants are a collection agency that deals exclusively in student loan collections.

30. The loan servicers, including Defendants, are largely to blame for the student loan system's poor state of affairs.

31.    Student loan servicers, like Defendants, are often profit-driven, publicly-traded companies, or subsidiaries thereof.

32.    In its May 12, 2014 Quarterly Report, SLM Corporation reported income from interest on student loans of $1,293,000,000. SLM Corporation Form 10-Q, Filed with the Securities and Exchange Commission May 12, 2014, available at

http://www.sec.gov/Archives/edgar/data/1032033/000119312514195006/d694924d10q.htm

Thus, in three months, SLM Corporation made over a billion dollars in student loan interest alone.

33.    However, collection of over a billion dollars in interest per quarter does not seem to be enough for Defendants. Instead, student loan institutions have been employing business policies and practices that maximize profits at the expense of students, who were forced to take out student loans as the only way to obtain "The American Dream."

*Investigations and Complaints against Defendants*

34.    According to the Consumer Financial Protection Bureau's 2014 report, from October 1, 2013, through September 30, 2014, the Bureau handled approximately 5,300 private student loan complaints, an increase of approximately 38% compared to that of the previous year. Exhibit B, Annual Report of the CFPB Student Loan Ombudsman, October 16, 2014, available at

http://files.consumerfinance.gov/f/201410_cfpb_report_annual-report-of-the-student-loan-ombudsman.pdf

35.    Of these complaints, almost half – 1,996 – were made against Defendants. *Id.*

36.    There were also an additional 2,700 debt collection complaints related to student loans during that period. Of those complaints, 374 were in regards to private student loan debt collection practices; more than half those complaints – 211 – were made against Defendants. *Id.*

37.    More importantly, in 2013, the FDIC initiated an action against Defendants, accusing them of employing unfair and deceptive business practices.

7

38.     In May of 2014, the FDIC entered into an agreement with Sallie Mae, Inc. and Navient Solutions, Inc., where the FDIC determined Sallie Mae and Navient Solutions had engaged in unfair and deceptive practices by (1) inadequately disclosing its payment allocation methodologies to borrowers while allocating borrowers' payments across multiple loans in a manner that maximizes late fees and (2) misrepresenting and inadequately disclosing in its billing statements how borrowers could avoid late fees.

39.     Similarly, here, in order to maximize their profits, Defendants have employed business practices that are unfair and deceptive, in that, Defendants' routinely misapply student loan payments and shift loan interest to loan principal when a student loan debtor insists on the correct application of his or her student loan payments.

40.     The CFPB details the actions of Defendants or similar to the actions Defendants in its 2013 Annual Report of the CFPB Student Loan Ombudsman ("the 2013 Ombudsman's Report"). Exhibit C, released October 16, 2013, available at

http://files.consumerfinance.gov/f/201310_cfpb_student-loan-ombudsman-annual-report.pdf

41.     The 2013 Ombudsman's Report states:

Opaque or inaccurate payment processing emerged as a significant trend in complaints received during the reporting period. It is unlawful for any private student lender to impose a penalty on a borrower making an early payment or making a payment in excess of the minimum amount due. However, borrowers remitting extra payments in order to pay off their loans more quickly find that payments are not always properly allocated.

*Id.*

42.     The 2013 Ombudsman's Report, in the section entitled "Payment Processing Problems" further states:

**While a notable number of consumers are struggling to afford their monthly student loan obligations, many consumers are in a stable financial position and attempt to pay off their loans early. Since refinance options are limited, the only**

way to escape high rates or poor customer service is to pay off loans more quickly. This also reduces the total interest paid over the life of the loan. Many consumers face stumbling blocks, snags, and surprises when it comes to payment processing practices.

**Poor communication about payment application.** Complaints reveal that the manners in which payments are processed are opaque, causing confusion and frustration for many borrowers.

Many consumers find that they are unable to verify whether payments are appropriately applied when they make additional payments in order to pay off their loans more quickly. Typically, companies will first apply payments to satisfy outstanding fees and interest and then allocate any additional funds to principal. Generally, interest accrues daily on student loans, and therefore, the amount of the payment that is applied to principal depends on when the payment is submitted.[8]

FN8 To calculate the amount of interest accruing daily, multiply the principal balance on a loan by its interest rate and then divide the product by the number of days in the year. For example, if a consumer has a loan balance of $10,000 with an interest rate of 9%, the daily interest would be: ($10,000 x 9%) / 365 = $2.47. By this calculation, the consumer's loan accrues $2.47 of interest per day.

There is significant confusion about payment policies with regard to "paid ahead" or "advanced payment" status. Borrowers note that after submitting additional payments, they were placed in "paid ahead" or "advanced payment" status. This raises questions for many borrowers as to whether funds have been held in order to satisfy a future payment or whether the servicer has actually applied the payment toward the principal balance.

If the additional payment is enough to satisfy only a portion of the next installment, the "total amount due" on the next month's billing statement will reflect the additional payment by reducing the next monthly installment due. However, if the consumer remits a payment to satisfy a full future installment, the next billing statement may reflect a $0.00 minimum payment.

| ANDREA CONSUMER | | Account Number | Date Billed | Date Due | |
|---|---|---|---|---|---|
| | | 123456798 | 10/01/2013 | 10/25/2013 | |
| Date Last Payment Received | Principal Paid Since Last Statement | Interest Paid Since Last Statement | Fees Paid Since Last Statement | | Total Received Since Last Statement |
| 09/01/2013 | $55.27 | $71.41 | $0.00 | | $126.68 |
| 09/08/2013 | $83.66 | $16.34 | $0.00 | | $100.00 |
| Amount Past Due | Current Due | Total Principal and Interest Due | Outstanding Late Fees to Date | | |
| $0.00 | $26.68 | $26.68 | $0.00 | | |

| Loan | First Disb. | Status | Owner | Monthly Payment | Rate | Balance Due | Current Due | Total Amt. |
|---|---|---|---|---|---|---|---|---|
| 1-01 | 09/01/2008 | REPAY | Bank X | $126.68 | 9.00% | $9,381.88 | $26.68 | $26.68 |

It may be helpful to think about these processes as two separate consequences of a prepayment — the consumer will likely both reduce their principal and "pay ahead" their student loan.

Consumers have expressed confusion when receiving a bill for $0.00 amount due, leading many to be unsure as to whether their automatic debit payment will be processed or if they need to submit a payment the following month. Frequently, consumers do not know if their additional payment was actually applied to principal or whether it was used to satisfy a future installment.

Many companies use the "paid ahead" status as a payment processing policy in order to assist borrowers in avoiding default or delinquency in the event of a future missed payment, but billing statements and online servicing platforms do not appear to clearly explain this policy. Student loan servicers generally state that this practice does not affect the application of payment toward fees, interest, or principal.

**Stumbling blocks when making payments in excess of the minimum amount due.** A number of private student loan borrowers note significant difficulties when submitting a single payment to cover several loans associated with the same servicer. These borrowers claim that payments are generally not applied in a way that helps them to pay off their loans with the highest rates.

The typical student loan borrower will generally take out multiple loans when paying for college, often with a new disbursement each semester. It is common for

borrowers to have three or four loans bundled into a single account ("billing group") managed by a given student loan servicer.

These loans often have different balances, different interest rates, and different amortization schedules. As a result, it may be complicated for consumers to determine how to best apply their payments.

Even when the payment is accompanied by an explicit instruction, the complaints revealed that many student loan servicers elect to apply extra payments as they see fit — and not necessarily in the way that offers the greatest benefit to the borrower. Borrowers report that the policies governing the treatment of payments when applied to multiple loans within one billing group are particularly difficult to understand and navigate.

Consider a student loan borrower entering repayment with $30,000 in private student loans. This borrower has three loans, each with a balance of $10,000. One loan has an interest rate at seven percent, one at nine percent and one at 13 percent. This borrower receives one bill each month, covering all three loans. Her minimum monthly payment would be just under $400 and she could expect to pay off her loans over ten years.

After making minimum payments for a year, the borrower decides to send in an extra $100 in order to try and pay down her debt more quickly. If the borrower does not include explicit instructions on how to process her loan payment, her student loan servicer will have to decide how to apply this extra $100 across her three loans.

Since she is paying off an extra $100 in principal, she will pay off her loans faster and she will pay less interest over the lifetime of her loans. However, the amount of money she will save can vary widely depending on what her servicer chooses to do next.

| | Starting Balance | Standard Monthly Payment | Extra $100 Split Evenly | Extra $100 Pro-Rated | Extra $100 Applied to Highest Interest Rate Loan |
|---|---|---|---|---|---|
| Loan 1-01 (7% interest rate) | $10,000 | $116.11 | $149.44 | $145.72 | $116.11 |
| Loan 1-02 (9% interest rate) | $10,000 | $126.68 | $160.02 | $158.98 | $126.68 |
| Loan 1-03 (13% interest rate) | $10,000 | $149.31 | $182.64 | $187.40 | $249.31 |
| Total One-Time Monthly Payment | | $392.10 | $492.10 | $492.10 | $492.10 |
| Savings at Payoff | | | $143.91 | $149.82 | $219.47 |

If her student loan servicer decides to divide her extra $100 evenly between her three loans, she'll save $143.91 over the life of the loan. If her loan servicer decides to apply her extra payment to her account, pro-rated based on the monthly amount due for each loan (the most common servicing practice), she will save $149.82.

By comparison, if her loan servicer credited her entire additional payment to the loan with the highest interest rate, she would save $219.47 — nearly 50 percent more than the amount she would save through pro-rated application of her $100 additional payment.[9]

FN9 Applying additional payments to the loan with the highest interest rate generally leads to the most savings for consumers over the long term. Borrowers can maximize savings by directing any payments in excess of the minimum amount due toward the loan with the highest interest rate. Once the loan with the highest interest rate is paid off, borrowers can continue to make the same monthly payment, directing the overage toward their next-highest-rate loan, repeating this process until all loans are repaid. However, there may be some cases where a borrower may want to allocate extra payments to other loans when considering other factors, such as employer loan forgiveness programs or cash flow management. In the credit card market, payments in excess of the minimum amount due must be allocated toward balances at the highest interest rate, pursuant to reforms in the Credit CARD Act of 2009.

Now consider a situation where a borrower submits an extra payment of $100 every month until her loans are paid-in-full. She would save more than $4,500 in accrued interest and pay off her loans in fewer than eight years — a great financial choice for consumers who can afford to take this route. But, once again, her total savings will depend on what her servicer does.

| | Starting Balance | Standard Monthly Payment | Extra $100 Split Evenly | Extra $100 Pro-Rated | Extra $100 Applied to Highest Interest Rate Loan |
|---|---|---|---|---|---|
| Loan 1-01 (7% interest rate) | $10,000 | $116.11 | $149.44 | $145.72 | $116.11 |
| Loan 1-02 (9% interest rate) | $10,000 | $126.68 | $160.02 | $158.98 | $126.68 |
| Loan 1-03 (13% interest rate) | $10,000 | $149.31 | $182.64 | $187.40 | $249.31 |
| Total One-Time Monthly Payment | | $392.10 | $492.10 | $492.10 | $492.10 |
| Savings at Payoff | | | $4,514.98 | $4,613.31 | $5,403.62 |

If her student loan servicer decides to divide her extra $100 per month evenly between her three loans, she'll save $4,514.98. If her loan servicer decides to apply

12

her payments to her account pro-rated based on the monthly amount due for each loan (the most common servicing practice), she will save $4,613.31. By comparison, if her loan servicer credited her entire payment to the loan with the highest interest rate, she would save $5,403.62 — nearly $800 more than she would save through the pro-rated application of her $100 payment.

Consumers report that, by default, online payment platforms distribute extra payments according to other payment allocation policies, instead of applying extra payments to the loans with the highest interest rates. These consumers have submitted complaints describing how they often run into difficulty when requesting that their servicer adjust an extra payment to apply to the loan with the highest interest rate.

…

**Difficulty obtaining accurate payoff information.** Consumers report that they are unable to obtain accurate payoff information from their servicers. Some consumers state that they receive different payoff amounts from different customer service representatives and are unable to receive a definitive answer. Other consumers report obtaining a payoff balance, remitting the correct payment amount and assuming their debt to be paid in full, only to discover that their payoff balance was incorrect and their account remained open with a small remaining balance. Consumers stated that they were unaware of the remaining balance until contacted by a debt collector after the loan was severely delinquent or in default.

*Id.*

## Why Extra Payments to Principal Matter

43.   Total student loan debt, similar to many loans, is comprised of both principal and interest.

44.   Principal loan debt is the amount of capital initially borrowed from the lender.

45.   Interest loan debt is an amount of debt that accumulates based on a particular function which incorporates outstanding principal, a specified interest rate, and time.

46.   Interest on student loans typically accrues daily. Daily interest, however, does not accrue on previously accrued interest.

47.   Most student loan interest accrues according to the following formula:

13

(Current principal balance x interest race) ÷ number of days per year = daily interest

48.    The loans that Defendants "service" accrue interest according to the following formula:

(Current principal balance x interest race) ÷ number of days per year = daily interest

49.    Accordingly, the higher the current principal balance, the more interest that accrues per day. Likewise, the lower the current principal balance, the less amount of interest that accrues per day.

50.    Therefore, two student loans with the same total balance and interest rate may accrue interest at different rates if one loan has a higher principal balance.

51.    For example, if a student loan debtor's current balance due is $10,500.00, with $10,400.00 owing in principal and $100.00 owing in interest, and his or her scheduled payment is $500.00, with $400.00 to go to principal and $100.00 to go to interest, and if they made his or her scheduled payment only, he or she would have a total remaining loan balance of $10,000.00, for which interest for the next month would accrue. However, if the student loan debtor paid an extra $100.00 payment, i.e. a $600.00 total payment, with $500.00 to principal and $100.00 to interest, he or she would have a total remaining balance of $9,900.00 for which interest the next month would accrue. As such, logically, the student loan borrower would pay less interest thereafter on a $9,900.00 principal balance, rather than a $10,000.00 principal balance.

52.    If, however, Defendants refused to apply the $100.00 extra loan payment to principal only, but rather applied it ahead to future payments or to other loans, the student loan borrower who should only accrue interest on $9,900.00 would still actually pay interest on the higher $10,000.00 principal amount.

53.    Therefore, over the life of the loan, the student loan debtor, who attempted to pay off his or her loans early, would not benefit from the extra payment, but rather would pay

14

significantly more in interest because Defendant refused to apply the extra payment to principal only.

54.     Further, the 2013 Ombudsman's Report details how different application by loan servicers, like Defendants, can greatly affect the total payoff amount of a student loan. *See*, *supra*.

### Defendants' Interest in Maintaining High Principal Balances on Student Loans

55.     Defendants' have a strong financial interest in preventing student loan debtors from paying additional interest more quickly that scheduled – larger profits.

56.     SLM Corporation and the other Defendants attempt to keep their profits high by not allowing student loan debtors to pay off their loans early.

57.     Defendants especially fear early and extra student loan payments, which directly "reduce servicing revenues" and cause "fees [earned] as a servicer" to decrease.

58.     This is not conjecture. Rather, SLM Corporation, in its 2013 Annual Report stated "*Higher than expected prepayments of loans could reduce servicing revenues or reduce or delay payments we receive as the holder of the Residual Interests of securitization trusts holding education loans.*" (Bold and italics in original). SLM Corporation 11-K, filed with the SEC on February 19, 2014, available at:

http://www.sec.gov/Archives/edgar/data/1032033/000119312514058942/d638950d10k.htm

59.     Further, SLM Corporation, in the same Annual Report, stated "When education loans contained within a securitization trust are prepaid, the fees we earn as servicer decrease and the value of any Residual Interest we own in the securitization trust may decline." *Id*.

60.     As described more fully below, Defendants utilize a system of intentional misapplication of student loan payments, and then, when a student loan debtor requests that an extra loan payment be applied in accordance with that debtor's request, Defendants impermissibly

shift accrued interest back to principal in an effort to slow down those student loan debtors who are attempting to pay off their loans early.

*Defendants' Systematic Misapplication of Student Loan Payments*

61.     Prior to December 31, 2013, Plaintiff had one billing account or "Biller."

62.     This Biller, Loan 2103, was linked to all three of Plaintiff's individual private loans – Loan 0756, Loan 0749, and Loan 6184.

63.     As such, Plaintiff would make one payment to Biller 2103 in her US Bank payment center.

64.     Defendants would then divide that payment across all three private loans, Loan 0756, Loan 0749 and Loan 6184.

65.     On September 23, 2013, a $200.00 payment was made to all three private loans Private Loan 2103.

66.     From the $200.00 payment of September 23, 2013, Loan 0756 received $28.80.

67.     From the $200.00 payment of September 23, 2013, Loan 0749 received $8.24.

68.     From the $200.00 payment of September 23, 2013, Loan 6184 received $162.96.

69.     Defendants determined how the payment amount was dispersed between each loan.

70.     On October 4, 2013, a $200.00 payment was made to all three private loans under Private Loan 2103.

71.     From the $200.00 payment of October 4, 2013, Loan 0756 received $28.80.

72.     From the $200.00 payment of October 4, 2013, Loan 0749 received $8.24.

73.     From the $200.00 payment of October 4, 2013, Loan 6184 received $162.96.

74.     Defendants determined how the payment amount was dispersed between each loan.

75.     On October 17, 2013, a $300.00 payment was made to all three private loans under Private Loan 2103.

76.     From the $300.00 payment of October17, 2013, Loan 0756 received $43.21.

77.     From the $300.00 payment of October 17, 2013, Loan 0749 received $12.35.

78.     From the $300.00 payment of October 17, 2013, Loan 6184 received $244.44.

79.     Defendants determined how the payment amount was dispersed between each loan.

80.     On November 15, 2013, a $300.00 payment was made to all three private loans under Private Loan 2103.

81.     From the $300.00 payment of November 15, 2013, Loan 0756 received $42.91.

82.     From the $300.00 payment of November 15, 2013, Loan 0749 received $12.27.

83.     From the $300.00 payment of November 15, 2013, Loan 6184 received $244.82.

84.     Defendants determined how the payment amount was dispersed between each loan.

85.     On December 17, 2013, a $300.00 payment was made to all three private loans under Private Loan 2103.

86.     From the $300.00 payment of December 17, 2013, Loan 0756 received $41.81.

87.     From the $300.00 payment of December 17, 2013, Loan 0749 received $11.89.

88.     From the $300.00 payment of December 17, 2013, Loan 6184 received $246.30.

89.     Defendants determined how the payment amount was dispersed between each loan.

90.     At the direction of Defendants, and on or about December 17, 2013, Plaintiff created a separate Biller for each individual private loan in her US Bank bill payment center.

91.     This forced Plaintiff to create a unique Biller for each individual private loan.

92.     Each Biller was created using the entire Loan Number.

93.     Loan 0756 was assigned a separate Biller using Loan ████████ 0756 as the recipient loan number.

94.     Loan 0749 was assigned a separate Biller using Loan ████████ 0749 as the recipient loan number.

17

95.     Loan 6184 was assigned a separate Biller using Loan ████████ 6184 as the recipient loan number.

96.     This separation and creation of multiple Billers, each of which utilized the full recipient loan number, would, according to Defendants' representatives, allow Plaintiff to send separate payments to each individual private loan in the exact amount she wanted applied to each loan.

97.     When Plaintiff added the separate Billers for each of her three private loans, Plaintiff's bank, US Bank, stated that it had a "relationship" with Defendant Sallie Mae. Plaintiff was able to connect each separate loan account number to Defendant Sallie Mae with a minimal amount of Defendants' business information.

98.     On December 31, 2013, Plaintiff made an extra $500.00 payment to Bar Study Loan 6184 only, by directing the extra payment using the newly-created, wholly separate Biller for Bar Study Loan 6184.

99.     This $500.00 payment was an additional $500.00 over what was owed for December 2013 and, since the scheduled monthly payment for December had already been made, was intended and should have been to be applied to principal only.

100.    However, instead of only being applied to Bar Study Loan 6184, Plaintiff's extra payment was wrongfully applied as follows:

a.      $69.52 was applied to Loan 0756 ($59.75 subtracted from principal, $9.77 subtracted from interest);

b.      $19.76 was applied to Loan 0749 ($16.98 subtracted from principal, $2.78 subtracted from interest); and

c.      $410.72 was applied to Bar Study Loan 6184 ($331.33 subtracted from principal, $79.39 subtracted from interest), the Loan that should have decreased by $500.00.

18

101.    In early January, 2014, Plaintiff called Defendant Sallie Mae and told the representative that (1) her payment to Bar Study Loan 6184 had been divided between all three loans and (2) her extra payment was incorrectly applied to interest, rather than principal only.

102.    At that time, Plaintiff alerted Defendant Sallie Mae that her online bank payments were no longer to a general private loan account (Loan 2103); rather, Plaintiff, at Defendants' direction, had added new Billers for each of her three private loans. Further, Plaintiff made clear that the individual loan numbers and each connected Biller had identical numbers.

103.    Accordingly, Plaintiff alerted Defendant Sallie Mae that she wanted her individual payments applied only to the loan listed on the online Biller for which that payment had been made. Stated differently, if Plaintiff directed a payment to Loan 0756 by using the Biller that had an identical account number to Loan 0756, Plaintiff wanted that payment applied to Loan 0756 – and Loan 0756 alone.

### Defendants' Wrongful, Principal–to–Interest Shifting "Reversals"

104.    In response to Plaintiff's request to have her extra payment applied correctly, Defendant Sallie Mae reversed the December 31, 2013 payment it had apportioned between all three of the Plaintiff's private loans.

105.    Sallie Mae reversed the $69.52 payment to Loan 0756, reversed the $19.76 payment to Loan 0749, and reversed the $410.72 payment to Bar Study Loan 6184.

106.    Defendants reversed the payments retro-actively, so that the transactions all were applied to the account on the December 31, 2013 date.[1]

107.    However, when Defendants reversed the payments that they had misapplied, Defendants added more principal to each loan than before the extra loan payment was made.

---

[1] The reversal was retro-active because interest accrues daily. Thus, any corrections within the system must be performed retroactively to ensure that the correct amount of interest is charged.

108.    For Loan 0756, when Defendants reversed the $69.52 that they misapplied, they actually added $69.77 back to principal (instead of $59.75, the amount subtracted from principal) and subtracted an additional $0.25 in interest (Defendants had already subtracted $9.77 in interest).

109.    This series of transactions returned the total amount of Loan 0756 to its pre-December 31, 2013 balance, however the principal-interest composition of Loan 0756 was impermissibly altered.

110.    As a result of Defendants' reversal, on December 31, 2013, $10.02 was added to Loan 0756's principal ($69.77 added to principal minus the $59.75 that had been subtracted from principal).[2]

111.    For Loan 0749, when the misapplied $19.76 was reversed, $19.83 was added back to principal (instead of $16.98, the amount subtracted from principal) and subtracted an additional $0.07 in interest (Defendants had already subtracted $2.78 in interest).

112.    This series of transactions returned the total amount of Loan 0749 to its pre-December 31, 2013 balance, however the principal-interest composition of Loan 0749 was impermissibly altered.

113.    As a result of Sallie Mae's reversal, on December 31, 2013, $2.85 was added to Loan 0749's principal ($19.83 added to principal minus the $16.98 that had been subtracted from principal).

114.    For Bar Study Loan 6184, when the misapplied $410.72 was reversed, $413.15 was added back to principal (instead of $331.33, the amount subtracted from principal) and subtracted an additional $2.43 in interest (they had already subtracted $79.39 in interest).

---

[2] The reversal was not actually made on December 31, 2013, but because of retroactive applications and reversals, Plaintiff's billing statements show the transactions occurring on December 31, 2013.

115.     This series of transactions returned the total amount of Bar Study Loan 6184 to its pre-December 31, 2013 balance, however the principal-interest composition of Bar Study Loan 6184 was impermissibly altered.

116.     As a result of Sallie Mae's reversal, on December 31, 2013, $81.82 was added to Loan 6184's principal ($413.15 added to principal minus the $331.33 that had been subtracted from principal).

117.     Then, Defendants applied the original $500 payment to Bar Study Loan 6184, as originally sought by Plaintiff, but subtracted $502.97 from principal and added $2.97 to interest.

118.     After dealing with this extra–payment fiasco, Plaintiff called Defendant Sallie Mae and inquired on how to make extra payments online that would apply to principal only.

119.     Defendants' representative told Plaintiff that extra payments to principal could be made two ways: (1) by calling Defendants each time any extra payment was made and reminding Defendants to apply the extra amount paid to principal only, or (2) by making two payments on the same day.

120.     For the second method, Defendants' representative instructed Plaintiff to make the first payment in the regular payment amount owed. This, according to Defendants' representative, would pay all accrued interest and all scheduled principal.

121.     Defendants' representative instructed Plaintiff to then make the second payment on the same day as the regular monthly payment. This payment method, Plaintiff was told, would allow the entire extra payment to be applied exclusively to principal, as the accrued interest would have been paid by the first transaction.

122.     However, despite numerous phone calls by Plaintiff and following specific instructions from Defendants' representatives, Defendants repeatedly refused to apply the payments to individual designated loans (designated Biller) only.

123.    Further, despite numerous phone calls by Plaintiff and following specific instructions from Defendants' representatives, Defendants repeatedly refused to apply extra payments to principal only and, instead, continued to apply all payments to both principal and interest on all of Plaintiff's three separate loan billers.

124.    Therefore, rather than applying each payment to accrued interest and principal of the individual loan designated by Plaintiff, Defendants divided each payment between all three loans.

125.    Thus, when Plaintiff made a payment to Loan 0756 only, using the Biller that utilized the entire loan number, Defendants would divide that payment between Loan 0756, Loan 0749 and Bar Study Loan 6184.

126.    Defendants' system, in turn, caused each of Plaintiff's three loans to have multiple payments made to both principal and interest.

127.    This led to Defendants' ultimate goal. After Defendants' disregarded Plaintiff's instruction for her loan payments (i.e., by applying payments designated to a specific loan Biller to a wholly separate loan), Plaintiff's extra payments, which Plaintiff directed toward paying off one loan's principal early, was diverted to payment of principal and interest of all three loans.

128.    Defendants created a system where, even though Plaintiff directed a payment to a specific loan by using the complete loan number, Defendants disregarded which loan the payment was directed to, applied the loan as they saw fit between three loans, and applied the loan as they saw fit between the principal and interest of the three loans.

129.    For her required January 2013 payment, Plaintiff owed $38.77 on Loan 0756, $11.09 on Loan 0749, and $220.50 on Bar Study Loan 6184. These amounts were the required monthly payment for each loan, as set by Defendants.

130.    Accordingly, on January 17, 2014, Plaintiff made (1) a $38.77 regular payment to Loan 0756, (2) a $75.00 extra, principal-only payment to Loan 0756, (3) an $11.09 regular payment

to Loan 0749, (4) a $50.00 extra, principal-only payment to Loan 0749, (5) a $220.50 regular payment to Bar Study Loan 6184, and (6) a $250.00 extra, principal-only payment to Bar Study Loan 6184.

131.    However, Defendants impermissibly applied each payment to each loan, even though Plaintiff used each loan's designated Biller (which, again, consisted of the full loan account number). Further, Defendants spread the amount paid over both principal and interest, even though Plaintiff followed the directions given to her by Defendants' representative to make both her regular and extra, principal-only payments on the same date.

132.    After January 17, 2014, Plaintiff called Defendants and alerted them, again, that they had misapplied her loan payments.

133.    Plaintiff again told Defendants that her online Billers for each of her three private loans had their own individual loan numbers, which mirrored the loan account numbers.

134.    As such, Plaintiff alerted Defendants that her payments should not be split between each of her multiple private loans, but rather should only be applied to the loan number listed on the respective online Biller.

135.    After continued requests by Plaintiff, Defendants attempted to correct the misapplication of payments, but, instead, applied each payment to each loan. Thus, while Plaintiff made six payments, with each loan to have two payments (the scheduled monthly payment and the extra principal-only payment), each of the three loans would have a partial payment from each of the six payments.

136.    Due to Defendants' continued misapplication of loan payments, the following series of payments occurred for the January 17, 2014 payments:

a.    Loan 0756 has six (6) payments: $30.65 ($30.65 subtracted from principal, $0 to interest), $5.39 ($2.29 subtracted from principal, $3.10 subtracted from interest),

23

$34.75 ($34.75 subtracted from principal, $0 to interest), $10.42 ($10.42 subtracted from principal, $0 to interest), $6.95 ($0 subtracted from principal, $6.95 subtracted from interest), $1.54 ($0 subtracted from principal, $1.54 subtracted from interest).

b.   Loan 0749 has six (6) payments: $1.97 ($0 subtracted from principal, $1.97 to interest), $1.53 ($0.65 subtracted from principal, $0.88 subtracted from interest), $9.87 ($9.87 subtracted from principal, $0 to interest), $8.71 ($8.71 subtracted from principal, $0 to interest), $0.44 ($0 subtracted from principal, $0.44 subtracted from interest), $2.97 ($2.97 subtracted from principal, $0 subtracted from interest).

c.   Bar Study 6184 Loan has six (6) payments: $9.11 ($0 subtracted from principal, $9.11 to interest), $41.08 ($0 subtracted from principal, $41.08 subtracted from interest), $31.85 ($0 subtracted from principal, $31.85 subtracted from interest), $205.38 ($205.38 subtracted from principal, $0 to interest), $181.14 ($181.14 subtracted from principal, $0 subtracted from interest), $61.61 ($49.21 subtracted from principal, $12.40 subtracted from interest).

137.   Due to Defendants' confusing loan transaction history, Plaintiff was unable to determine at that time and continues to be uncertain if her payments have been correctly applied.

138.   After the misapplication of the January 17, 2014 payments, Plaintiff called Defendants and asked them to list only the two (2) payments she had made to each loan on that loan, rather than all six (6) of her payments. Defendants' representative told Plaintiff that he could not do that.

139.   On February 14, 2014, Plaintiff made (1) a $38.77 regular payment to Loan 0756, (2) a $11.09 regular payment to Loan 0749, (3) a $220.50 regular payment to Bar Study Loan 6184, and (4) a $250.00 extra, principal-only payment to Bar Study Loan 6184.

140. However, again, Defendants did not apply these payments correctly, either; instead, Defendants applied each payment to each loan.

141. As a result, Plaintiff called Defendants and, again, alerted them of their misapplication.

142. Plaintiff again told Defendants that her online Billers for each of her three private loans had their own individual loan numbers, which mirrored the loan account numbers.

143. As such, Plaintiff alerted Defendants that her payments should not be split between each of her multiple private loans, but rather should only be applied to the loan number listed on the online Biller.

144. Defendants, again, instead of applying the payments correctly, applied each payment to each loan and, when Defendants retroactively reversed several of the payments, they again impermissibly added more principal to the loan amounts.

145. Thus, Loan 0756 has (4) payments: $31.40 ($19.46 subtracted from principal, $11.94 to interest), $35.60 ($35.60 subtracted from principal, $0 to interest), $1.58 ($0 subtracted from principal, $1.58 subtracted from interest), and $5.52 ($0 subtracted from principal, $5.52 subtracted from interest).

146. For Loan 0756, Defendants correctly reversed the $35.60 payment to principal only, adding $35.60 in principal.

147. However, when Defendants reversed the $1.58 payment to interest only, $1.58 was added back to principal, rather than interest owed.

148. Likewise, when Defendants reversed the $5.52 payment to interest only, $5.52 was added back to principal, rather than interest.

149. Additionally, Loan 0749 has four (4) payments: $8.93 ($5.53 subtracted from principal, $3.40 to interest), $10.12 ($10.12 subtracted from principal, $0 to interest), $0.45 ($0

subtracted from principal, $0.45 subtracted from interest), and $1.57 ($0 subtracted from principal, $1.57 subtracted from interest).

150.     For Loan 0749, when Defendants reversed the $1.57 payment to interest only, $1.57 was added back to principal, rather than interest owed.

151.     Finally, Bar Study Loan 6184 has eight (8) payments: $1.58 ($1.58 subtracted from principal, $0 to interest), $1.57 ($1.57 subtracted from principal, $0 subtracted from interest), $5.52 ($5.52 subtracted from principal, $0 to interest), $9.06 ($0 subtracted from principal, $9.06 to interest), $31.68 ($0 subtracted from principal, $31.68 subtracted from interest), $180.17 ($70.49 subtracted from principal, $109.68 subtracted from interest), $204.28 ($204.28 subtracted from principal, $0 to interest), and $35.60 ($35.60 subtracted from principal, $0 to interest).

152.     As a result of Defendants' reversal, on February 14, 2014, $7.10 was added to Loan 0756's principal ($1.58 and $5.52 was added to principal, when $0 had been subtracted from principal).

153.     As a result of Defendants' reversal, on February 14, 2014, $1.57 was added to Loan 0756's principal ($1.57 added to principal, when $0 had been subtracted from principal).

154.     Due to Defendants' confusing loan transaction history, Plaintiff was, again, unable to determine at that time and continues to be unable to determine if her payments had been correctly applied.

155.     However, Plaintiff was able to ascertain that Defendants' had impermissibly added principal to her loan balances.

156.     Defendants' acts were willful and targeted at Plaintiff for attempting to make early, extra payments to her student loans.

157.     On March 17, 2014, Plaintiff made (1) a $38.77 regular payment to Loan 0756, (2) a $75.00 extra, principal-only payment to Loan 0756, (3) an $11.09 payment to Loan 0749, (4) a $50.00

extra, principal-only payment to Loan 0749, (5) a $220.50 regular payment to Bar Study Loan 6184, and (6) a $250.00 extra, principal-only payment to Bar Study Loan 6184.

158.     On April 2, 2014, Plaintiff checked the payoff balance of Loan 0749, which Defendants' website stated was $695.51. Moments later, Plaintiff made a $695.51 payment to Loan 0749 which should have paid Loan 0749 in full. The $695.51 payment processed on April 2, 2014.

159.     Defendants incorrectly applied the March 17, 2014 payments and the April 2, 2014 payments to each of Plaintiff's loans (seven payments to each loan, alleged upon information and belief, and based on Plaintiff's best recollection, as Defendant's have removed this billing history, and thus Plaintiff has no way to confirm at this point), rather than applying each payment only to the loan listed on the Biller.

160.     On April 11, 2014, Plaintiff called Defendants and alerted them that her payments had, again, been incorrectly applied.

161.     Plaintiff requested that Defendants apply her payments only to the loan number that was listed on that payment's Biller.

162.     Plaintiff then told Defendants that if her payments were not applied according to the US Bank Biller amounts again, that she was going to file suit against them for Defendants' actions.

163.     Sometime after that April 11, 2014 phone call, where Plaintiff made it clear that she would sue Defendants if they did not apply her payments correctly, Defendants corrected the March 17, 2014 payments. At the time of filing this action, Plaintiff does not have access to records showing the incorrect payment application.

164.     For Loan 0756, Defendants then applied $38.77 to interest and principal, and $75.00 to principal only.

165.     For Loan 0749, Defendants then applied $11.09 to interest and principal, and $50.00 to principal only.

166.     For Bar Study Loan 6184, Defendants then applied $220.50 to interest and principal, and $250.00 to principal only.

167.     Additionally, Defendants then applied the $695.51 payment to Loan 0749 only.

168.     Thus, Defendants had the capacity and capability to correctly apply Plaintiff's student loan payments. They chose not to. Instead, Defendants attempted to slow Plaintiff from paying off her student loans early and, consequently, protect the full amount of interest they could collect.

169.     After April 11, 2014, Plaintiff also requested, via email, that Defendants provide Plaintiff a copy of her applications and promissory notes for her private loans.

170.     Sallie Mae provided applications and promissory notes for Loan 0756, Loan 0749 and Bar Study Loan 6184.

171.     On April 15, 2014, Plaintiff made a $38.77 payment and a $75.00 payment to Loan 0756 by check.

172.     Defendants correctly applied both payments. The $38.77 was applied as a regular scheduled payment, which paid accrued interest and principal. The $75.00 was applied to principal only.

173.     On April 15, 2014, Plaintiff made a $0.34 payment to Loan 0749 by check, which, according to Defendants' website, was the balance of the loan, even though Plaintiff had already, by her April 2, 2014 payment of $695.51, paid the total balance claimed by Defendants.

174.     On April 15, 2014, Plaintiff made a $220.50 payment and a $250.00 payment to Bar Study Loan 6184 by check.

175.     Defendants correctly applied both payments. The $220.50 was applied as a regular scheduled payment, which paid accrued interest and principal. The $250.00 was applied to principal only.

176.     On May 16, 2014, Plaintiff made a $38.77 payment and a $75.00 payment to Loan 0756.

177.     Defendants correctly applied both payments. The $38.77 was applied as a regular scheduled payment, which paid accrued interest and principal. The $75.00 was applied to principal only.

178.     On May 16, 2014, Plaintiff made a $50.00 payment to Loan 0749, even though Loan 0749 should have been paid in full on April 2, 2014. After Plaintiff ensured that no amount was truly owing on Loan 0749 (due Defendants' requiring an additional $0.34 payment after Plaintiff fully paid the total balance via bank transfer - $695.51 payment on April 2, 2014). Plaintiff called Defendants and had the $50.00 applied to Bar Study Loan 6184.

179.     On May 16, 2014, Plaintiff made a $220.50 payment and a $250.00 payment to Bar Study Loan 6184.

180.     Defendants correctly applied both payments. The $220.50 was applied as a regular scheduled payment, which paid accrued interest and principal. The $250.00 was applied to principal only.

181.     On June 17, 2014, Plaintiff made a $38.77 payment and a $75.00 payment to Loan 0756.

182.     Defendants correctly applied both payments. The $38.77 was applied as a regular scheduled payment, which paid accrued interest and principal. The $75.00 was applied to principal only.

183.     On June 17, 2014, Plaintiff made a $220.50 payment and a $250.00 payment to Bar Study Loan 6184.

184.    Defendants correctly applied both payments. The $220.50 was applied as a regular scheduled payment, which paid accrued interest and principal. The $250.00 was applied to principal only.

185.    On July 17, 2014, Plaintiff made a $38.77 payment, a $100.00 payment and a $500.00 payment to Loan 0756.

186.    Defendants correctly applied all three payments. The $38.77 was applied as a regular scheduled payment, which paid accrued interest and principal. The $100.00 was applied to principal only. The $500.00 was applied to principal only.

187.    On July 17, 2014, Plaintiff made a $220.50 payment and a $250.00 payment to Bar Study Loan 6184.

188.    Defendants correctly applied both payments. The $220.50 was applied as a regular scheduled payment, which paid accrued interest and principal. The $250.00 was applied to principal only.

189.    On August 15, 2014, Plaintiff made a $38.77 payment, a $75.00 payment and a $500.00 payment to Loan 0756.

190.    Defendants correctly applied both payments. The $38.77 was applied as a regular scheduled payment, which paid accrued interest and principal. The $75.00 was applied to principal only. The $500.00 was applied to principal only.

191.    On August 15, 2014, Plaintiff made a $220.50 payment and a $250.00 payment to Bar Study Loan 6184.

192.    Defendants correctly applied both payments. The $220.50 was applied as a regular scheduled payment, which paid accrued interest and principal. The $250.00 was applied to principal only.

193.    On September 2, 2014, Plaintiff made a $500.00 payment to Loan 0756.

30

194.     On September 11, 2014, Plaintiff wanted to pay off the total amount due on Loan 0756. However, due to Defendants' refusal to process her U.S. Bank payment to correctly pay off Loan 0749, Plaintiff was forced to use Defendant Sallie Mae's website and paid the balance of Loan 0756 in full – $1028.41.

195.     On September 17, 2014, Plaintiff made a $220.50 payment and a $430.00 payment to Bar Study Loan 6184.

196.     Defendants correctly applied both payments. The $220.50 was applied as a regular scheduled payment, which paid accrued interest and principal. The $430.00 was applied to principal only.

197.     On October 3, 2014, Plaintiff made an extra $1,000.00 payment to Bar Study Loan 6184. At time of making this $1,000.00 payment, Plaintiff had already satisfied the regular scheduled payment for September (an interest and principal payment).

198.     On October 17, 2014, Plaintiff made a $220.50 payment and a $430.00 payment to Bar Study Loan 6184.

199.     Defendants correctly applied both payments. The $220.50 was applied as a regular scheduled payment, which paid accrued interest and principal. The $430.00 was applied to principal only.

200.     On October 31, 2014, Plaintiff made an extra $300.00 payment to Bar Study Loan 6184.

201.     On or about November 3, 2014, Plaintiff realized that the October 3, 2014 payment of $1,000.00 and the October 31, 2014 payment of $300.00 were not applied correctly, in that both payments were applied to both interest and principal. On the same day Plaintiff called Defendants and requested that both of these extra payments be applied to principal only, as she had previously

been instructed to do by Defendants when she wanted to ensure extra payments were applied to principal only.

202.    Plaintiff also followed up on her telephone conversation with an email to Defendants after Plaintiff was told by a representative of Defendants that application to principal only was not possible.

203.    This representative placed Plaintiff on hold to speak with a supervisor about the matter, but in reality Defendants' representative disconnected his connection with Plaintiff.

204.    In sum, Defendants have constructed an opaque payment application system that continually disregards the explicit instructions of student loan debtors and intentionally attempts to thwart pre-payment of student loans by financially responsible student loan debtors. Defendants' computerized payment application system applies payments in a manner where a payment directed to a single loan is split between multiple loans, and extra, principal-only payments are applied to future interest and principal of multiple loans. Furthermore, Defendants repeatedly and purposely shifted interest to principal when they added the amount of a reversed payment to loan principal, regardless of whether the payment was originally applied to the loan's principal or interest. Defendants' actions attempt to counteract the early and extra payments of student loan debtors by actually causing the amount of student loan debtors' loan principal to increase. Therefore, student loan debtors who wanted to pay off principal early actually have more principal to pay off, and because the amount of principal was increased by Defendants, student loan debtors will pay more in interest over the life of the loan. Consequently, the borrower who is trying to pay off his or her loan(s) early, actually have less of their future payments applied to principal, because future payments instead pay off the additional interest that only accrued because Defendants' impermissibly shifted interest back to principal.

## CLASS ACTION ALLEGATIONS

205.    Plaintiff brings this action pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of herself and a class and subclass of persons similarly situated for declaratory, injunctive, and monetary relief, and defined as:

**Nationwide Class**
All individuals in the United States, who since December 29th, 2013 paid or attempted to make a payment on any private loans serviced by Defendants, and the payment was applied inconsistently with the individual's request, and who are not bound by an arbitration agreement with respect to at least one loan.

**Illinois Subclass**
All individuals in Illinois, who since December 29th, 2011 paid or attempted to make a payment on any private loans serviced by Defendants, and the payment was applied inconsistently with the individual's request and/or all individuals who had loan interest shifted to loan principal, and who are not bound by an arbitration agreement with respect to at least one loan.

Specifically excluded from the Class and Subclass are: (a) any officers, directors, or employees of Defendants, or any of their subsidiaries; (b) any judge assigned to hear this case (or spouse or family member of any assigned judge); (c) any employee of the Court; and (d) any juror selected to hear this case. The Class and Subclass are collectively referred to herein as the "Class" or "Subclass" unless otherwise indicated.

206.    Plaintiff asserts claims against Defendants, individually and on behalf of all class and subclass members for violations of the law as set forth below.

207.    The members of the Class and Subclass are ascertainable from objective criteria.

208.    If necessary to preserve the case as a class action, the Court itself can redefine the Class or Subclass, create additional sub-classes, or both.

209.    The requirements of Rule 23(a) are satisfied for the proposed class because the members of the proposed class are so numerous and geographically dispersed that joinder of all its members is impracticable. Although the exact number and identity of each class member is unknown at this time, there are believed to be at least thousands of potential Class members

nationwide, and hundreds or thousands of Subclass members in Illinois. Therefore, the "numerosity" requirement of Rule 23(a)(1) is met.

210.    The commonality requirement of Rule 23(a)(2) is satisfied because there are questions of law or fact common to Plaintiff and the other members of the proposed class. Among those common questions of law or fact are:

> a.   whether Defendants, through their acts or omissions, participated in unfair debt collection practices by misapplying customers payments;
>
> b.   whether Defendants, through their acts or omissions, engaged in false, deceptive, or misleading representations or means in connection with the collection debts;
>
> c.   whether Defendants employed unfair or deceptive means in applying student loan payments;
>
> d.   whether Defendants impermissibly shifted loan interest to loan principal when a student loan debtors insisted on the correct application of their payments;
>
> e.   whether Defendants actions were willful, intentional, and taken in bad faith;
>
> f.   whether Plaintiff and the members of the proposed class have sustained or continue to sustain damages as a result of Defendants' wrongful conduct, and, if so, the proper measure and appropriate formula to be applied in determining damages for the injuries sustained;
>
> g.   whether Plaintiff and the members of the proposed class are entitled to compensatory, consequential, exemplary, and punitive damages; and
>
> h.   whether Plaintiff and the members of the proposed class are entitled to declaratory, injunctive, or other equitable relief.

211.    Plaintiff's claims are typical of the claims of the proposed class that it seeks to represent, as described above, because they arise from the same course of conduct by Defendants and are based on the same legal theories. Further, Plaintiff seeks the same forms of relief for itself and the proposed class. Therefore, the "typicality" requirement of Rule 23(a)(3) is satisfied.

212.    Because her claims are typical of the proposed class that Plaintiff seeks to represent, Plaintiff has every incentive to pursue those claims vigorously. Plaintiff has no conflicts with, or

interests antagonistic to the proposed class. Plaintiff, a victim of unscrupulous debt collection and general business practices, is committed to the vigorous prosecution of this action, which is reflected in her retention of competent counsel experienced in complex and challenging litigation.

213.    Plaintiff's counsel satisfies the requirements of Rule 23(g) to serve as counsel for the proposed class. Plaintiff's counsel (a) has identified and thoroughly investigated the claims set forth herein, (b) has been involved in complex litigation; (c) has extensive knowledge of the applicable law; and (d) has or will have the resources to commit to the vigorous prosecution of this action, likely through co-counsel, on behalf of the proposed class. Accordingly, Plaintiff satisfies the adequacy of representation requirements of Rule 23(a)(4).

214.    In addition, this action meets the requirements of Rule 23(b)(2). Defendants have acted or refused to act on grounds generally applicable to Plaintiff and other members of the proposed class, making final injunctive or corresponding declaratory relief with respect to the proposed class appropriate.

215.    This action also meets the requirements of Rule 23(b)(3). Common questions of law or fact, including those set forth above, exist as to the claims of all members of the proposed class and predominate over questions affecting only individual class members, and a class action is superior – if not the only method – for the fair and efficient adjudication of this controversy.

216.    Class treatment will permit large numbers of similarly situated student loan debtors to prosecute their respective claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would produce.

217.    This action is manageable as a class action. Notice may be provided to members of the proposed class by first-class mail and through the alternative means, including electronic mail (email), internet postings including banner ads, distribution through social media, including

sponsored postings on Facebook and Twitter, and by publication. Further, the claims set forth below based on federal law will apply evenly to all proposed Class members. Moreover, claims based on Illinois law are alleged only on behalf of the Illinois Subclass. Thus, the superiority and manageability requirements of Rule 23(b)(3) are satisfied.

### COUNT I – ON BEHALF OF THE NATIONWIDE CLASS
### VIOLATION OF U.S. FAIR DEBT COLLECTION PRACTICES ACT SECTION 810

218.     Plaintiff incorporates paragraphs 1 – 217 as if fully set forth herein.

219.     The actions of Defendants violates the United States Fair Debt Collection Practices Act 15 U.S.C. § 1692, *et seq*.

220.     Specifically, 15 U.S.C. § 1692h, also known as Section 810 of the Fair Debt Collection Practices Act, states:

> If any consumer owes multiple debts and makes any single payment to any debt collector with respect to such debts, such debt collector may not apply such payment to any debt which is disputed by the consumer and, where applicable, shall apply such payment in accordance with the consumer's directions.

221.     Defendants consistently and repeatedly refused to apply Plaintiff's and Class members' payments in accordance with the consumer's directions.

222.     Defendants, although referred to as "student loan servicers" are essentially a collection agency that deals only in student loan debt.

223.     When Plaintiff or Class members would submit a payment to Defendant, even though the Plaintiff or Class members would list a specific loan number for that payment or give specific direction for the payment, Defendants would not apply the payment to the specified loan only or consistently with the student loan debtor's instructions.

224. Rather, Defendants would split the payment between the Plaintiff's and Class members multiple loans and, upon information and belief, apply each payment across multiple loans.

225. Additionally, when Plaintiff or Class members would attempt to make an extra payment to principal only, Defendants would not apply the extra payment to principal only, but rather would apply the payment to principal and interest or Defendants would apply the extra payment to other loans owed by the Plaintiff or Class members.

226. Plaintiff and all others similarly situated have suffered harm as a direct and proximate result of the violations of law and wrongful conduct of Defendants as alleged herein.

## COUNT II – ON BEHALF OF THE NATIONWIDE CLASS
## VIOLATION OF U.S. FAIR DEBT COLLECTION PRACTICES ACT SECTION 807

227. Plaintiff incorporates paragraphs 1 – 226 as if fully set forth herein.

228. The actions of Defendants violates the United States Fair Debt Collection Practices Act 15 U.S.C. § 1692, *et seq*.

229. Specifically, 15 U.S.C. § 1692e, also known as Section 807 of the Fair Debt Collection Practices Act, states:

> A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section:
> ...
> (2) The false representation of --
> the character, amount, or legal status of any debt; or
> …
> (10) The use of any false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer.

230. Defendants have and continue to consistently and repeatedly employ false, deceptive and misleading means in connection with the collection of their debt.

231.    Defendants, although referred to as "student loan servicers" are essentially a collection agency that deals only in student loan debt.

232.    Defendants purposely employ means, policies, and practices designed to mislead and deceive consumers/debtors and prevent consumers/debtors from paying off their loans early by:

a.   Reducing the monthly payment amount due if the consumer/debtor pays additional principal over what is the minimum amount due for his/her loan. Therefore, when the consumer's principal amount due is lessened, the Defendants reduce the minimum monthly payment due, causing the consumer's pay off date to remain the same, rather than decrease;

b.   Applying payments that should be applied to principal only to both principal and interest;

c.   Applying payments that should be applied to principal only to both principal and interest, even when the consumer/debtor specifically directs the payment to principal only;

d.   Applying single loan payments across multiple loans, so as to spread a payment out over multiple principals and interests, rather than one loan's principal and interest;

e.   Applying reversed payments incorrectly, so that more debt is added back to loan principal than was subtracted from the loan with the original payment, thus increasing the overall interest that was or will have to be paid on the loan;

f.   Employing an antiquated, confusing, and misleading online payment system to provide information to consumers/debtors, so as to prevent consumers/debtors from being able to understand their loan payments and applications;

g.   Refusing to apply payments only as directed by consumers/debtors in a clear manner in their online system;

h.   Refusing to apply payments only in the manner set forth by the consumer/debtor;

i.   Failing to provide consumers/debtors with a clear way to apply online payments to specific loans; and

233.    Plaintiff and Class members have suffered harm as a proximate result of the violations of law and wrongful conduct of Defendant alleged herein.

## COUNT III – ON BEHALF OF THE ILLINOIS SUBCLASS
## VIOLATION OF ILLINOIS UNFAIR PRACTICES ACT 815 ILL. COMP. STAT. 505

234.    Plaintiff incorporates paragraphs 1 – 233 as if fully set forth herein

235.    Pursuant to the Illinois Consumer Fraud and Deceptive Business Practices Act, "merchandise" includes "any objects, wares, goods, commodities, intangibles, real estate situated outside the State of Illinois, or services." 815 Ill. Comp. Stat. 505/1(b).

236.    Defendants' services are "merchandise" as defined by 815 Ill. Comp. Stat. 505/1(b).

237.    Pursuant to 815  Ill. Comp. Stat. 505/2:

Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act", approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby. In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5 (a) of the Federal Trade Commission Act.

238.    Defendants engaged in numerous unfair acts and practices in the servicing of Plaintiff's and Subclass members loans, including:

a.  Reducing the monthly payment amount due if the consumer/debtor pays additional principal over what is the minimum amount due for his/her loan. Therefore, when the consumer's principal amount due is lessened, the Defendants reduce the minimum monthly payment due, causing the consumer's pay off date to remain the same, rather than decrease;

b.  Applying payments that should be applied to principal only to both principal and interest;

39

c.   Applying payments that should be applied to principal only to both principal and interest, even when the consumer/debtor specifically directs the payment to principal only;

d.   Applying single loan payments across multiple loans, so as to spread a payment out over multiple principals and interests, rather than one loan's principal and interest;

e.   Applying reversed payments incorrectly, so that more debt is added back to loan principal than was subtracted from the loan with the original payment, thus increasing the overall interest that was or will have to be paid on the loan;

f.   Employing an antiquated, confusing, and misleading online payment system to provide information to consumers/debtors, so as to prevent consumers/debtors from being able to understand their loan payments and applications;

g.   Refusing to apply payments only as directed by consumers/debtors in a clear manner in their online system;

h.   Refusing to apply payments only in the manner set forth by the consumer/debtor;

i.   Failing to provide consumers/debtors with a clear way to apply online payments to specific loans; and

239.   Defendants' practices, as set forth above, were unfair in that:

a.   The practices were immoral, oppressive and unscrupulous in that they imposed upon student loan debtors with no meaningful choice, imposed an unreasonable burden on student loan debtors and was so oppressive as to leave student loan debtors with little alternative but to submit to the practices. Student loan debtors had no control over the Defendants' acts, and student loan debtors attempts to ensure that loan payments were applied correctly, such as creating a Biller that mirrored the full Loan Account number, were futile, and

b.   Student loan debtors cannot reasonably avoid the injury caused by Defendants', as Defendants are in ultimate control of student loan payment processing and routinely refuse to follow student loan debtors' instructions.

240.   Defendants' unfair practices and conduct were directed toward Plaintiff and other Subclass members.

40

241.    Defendants' intended for student loan debtors, including Plaintiff and Subclass members, to rely on their acts and practices in applying student loan payments correctly, including to the correct account, and, when applicable, correctly to interest and principal, or principal only, and reversing student loan payments correctly (so as not to shift interest to principal).

242.    Defendants' also intended for student loan debtors, including Plaintiff and Subclass members, to rely on their loan billing statements, emails and website as correct, even though the billing statements contained inflated principal balances, after Defendants impermissibly shifted loan interest to loan principal.

243.    Defendants' unfair and deceptive practices occurred during the course of conduct involving trade or commerce, specifically the collection of student loan debts.

244.    Plaintiff's and Subclass members' incurred damages due to student loan payments being applied in contradiction their instructions, Defendants incorrectly applying payments that should have paid only to principal to both future interest and principal, and Defendants' shifting non-interest accruing loan interest back to interest-accruing loan principal.

245.    Plaintiff's and Subclass members' damages were directly and proximately caused by Defendants' unfair acts and practices.

246.    Defendants' conduct was addressed to the market generally and otherwise implicates consumer protection concerns and, therefore, a consumer nexus exists in that:

> a.  Defendants' acts and practices in collecting student loans, misapplying loan payments, and impermissibly shifting interest to principal were directed to all individuals whose loans were serviced by Defendants; and
>
> b.  Defendants' acts and practices otherwise implicate consumer protection concerns including, but n o t l i m i t e d t o, promoting fair and upright business practices.

41

247.     Illinois Plaintiffs are authorized to bring a private action under the Illinois Consumer Fraud and Deceptive Businesses Practices Act pursuant to 815 Ill. Comp. Stat. 505/l0(a).

248.      Defendants' conduct was willful and intentional and done with evil motive or reckless indifference to the rights of others.  Punitive damages are thus warranted.

249.     Reasonable attorneys' fees and costs should be awarded pursuant to 815 Ill. Comp. Stat. 505/10a.

### COUNT IV – ON BEHALF OF THE ILLINOIS SUBCLASS
### BREACH OF CONTRACT – WRONGFUL PAYMENT APPLICATION

250.     Plaintiff sets forth Paragraphs 1 – 249 as if fully set forth herein.

251.     Plaintiff and Subclass members entered into contracts with Defendants.

252.     These contracts are contracts of adhesion. The provisions of which are drafted by Defendants.

253.     Plaintiff's loan documents for Loan 0756, Loan 0749, and Bar Study Loan 6184 are attached as Exhibit D, Exhibit E, and Exhibit F, respectively.

254.     Many of these contracts were entered into when students, such as Plaintiff and Subclass members, were in desperate need of additional financing for their education.

255.     These contracts contain provisions governing the application of payments.

256.     According to Plaintiff's contract for Loan 0749, Section I, entitled "RIGHT TO REPAY," "**I have the right to prepay all or any part of my loan at any time without penalty.**" Exhibit E, Loan 0749 Documents.

257.     Further, the Loan 0749 document payment application term states "Payments will be applied first to Late Charges, then to Payment Return Fees and Collection Costs, then to accrued

interest, and the remainder to principal. Payments in excess of the amount due will advance the next payment due date by the number of whole payments satisfied by the extra funds."

258.    This inconsistency creates ambiguity within the contract.

259.    Any ambiguity should be construed in the light most favorable to Plaintiff, and against the drafters of the contract – Defendants.

260.    However, Plaintiff and subclass members were permitted to prepay any or all of the debt owing. As such, extra payments should have been applied to outstanding principal only, as that is the only way any of the debt is actually prepaid.

261.    Defendants repeatedly breached their contractual obligations with respect to the proper application of student loan payments made by Plaintiff and Subclass members.

262.    Defendants repeatedly attempted to, and did apply student loan payment money that should have immediately reduced loan principal to future interest and principal.

263.    Defendants' motivation arises from the daily accrual of loan interest as a function of the principal loan balance.

264.    By applying current payment amounts to future payments, instead of loan principal, Defendants were able to allow more interest to accrue, and, therefore, make more money in accrued interest from the student loans that they serviced.

265.    Plaintiff and Subclass members were damaged by Defendants' repeated breaches.

266.    Plaintiff only seeks breach of contract damages arising out of Defendants' breaches of Loan 0749.

267.    Damages suffered include, but are not limited to: 1) student loan balances not decreasing properly due to misapplication of student loan payments; 2) paying interest that would not have accrued if Defendants had not breached their contracts and applied loan payments

correctly; and 3) time spent ensuring the correct payment application, after Defendants' misapplication of loan payments, generally in excess of three hours per month.

268.     Defendants' repeated breaches of their contracts were willful, intentional, and taken in bad faith. Therefore, punitive and/or exemplary damages are warranted.

### COUNT V – ON BEHALF OF THE ILLINOIS SUBCLASS
### BREACH OF CONTRACT – WRONGFUL PAYMENT REVERSALS

269.     Plaintiff sets forth Paragraphs 1 – 268 as if fully set forth herein.

270.     Plaintiff and Subclass members entered into contracts with Defendants.

271.     Many of these contracts were entered into when students, such as Plaintiff and Subclass members, were in desperate need of additional financing for their education.

272.     These contracts contain provisions governing principal, interest, and capitalization.

273.     Capitalization occurs when loan interest is converted into loan principal.

274.     Defendants, by repeatedly shifting loan interest to loan principal when "reversing" incorrectly applied student loan payments wrongfully capitalized loan interest.

275.     This wrongful capitalization constitutes a breach of contract.

276.     Plaintiff and Subclass members were damaged by Defendants' repeated breaches.

277.     Plaintiff only seeks breach of contract damages arising out of Defendants' breaches of Loan 0749.

278.     Damages suffered include, but are not limited to: 1) paying interest that would not have accrued if Defendants had not breached their contracts and had correctly reversed misapplied student loan payments such that loan interest was not added to loan principal; and 2) time spent ensuring the correct payment application, after Defendants' misapplication of loan payments, generally in excess of three hours per month.

279.    Defendants' repeated breaches of their contracts were willful, intentional, and taken in bad faith. Therefore, punitive and/or exemplary damages are warranted.

## PRAYER FOR RELIEF

Plaintiff, on behalf of herself and all others similarly situated, requests:

A.  Entry of preliminary and permanent injunctions providing that Defendants shall be enjoined from:

   i.    applying a student loan payment made and directed to one student loan across multiple student loans;

   ii.   misapplying extra student loan payments to both interest and principal when contractual provisions or student loan debtors direct payments to principal only; and

   iii.  shifting accrued loan interest to loan principal when a student loan debtor insists on the correct application of his or her student loan payments and "reversing" a payment is required; and

B.  Entry of judgment ordering Defendants to take affirmative steps to remediate opaque, confusing, and inadequate payment system, and the misapplication of student loan payments and wrongful, interest-shifting reversals;

C.  Entry of judgment finding:

   i.    Defendants violated the United States Fair Debt Collection Practices Act, Section 810;

   ii.   Defendants violated the United States Fair Debt Collection Practices Act, Section 807;

   iii.  Defendants violated the Illinois Consumer Fraud and Deceptive Practices Act, 815 Ill. Comp. Stat. 505;

    iv.    Defendants breached contracts when they applied extra, principal-only student loan payments to future interest and principal when contracts allowed prepayment of any or all of a loan without penalty; and

    v.    Defendants breached contracts when they essentially recapitalized accrued interest when "reversing" misapplied student loan payments; and

D.  Monetary damages including compensatory, exemplary, and punitive damages to which Plaintiff, Class members, and Subclass members are entitled and will be entitled at the time of trial, in an amount exceeding $5,000,000;

E.  Pre- and post-judgment interest;

F.  The costs of this action;

G.  Reasonable attorneys' fees; and

H.  Such other and further relief as the Court deems proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby requests a jury trial on all issues so triable.

Respectfully submitted,
Plaintiff Diana Eileen Wise,

By her attorney and attorney for the putative Class and Subclass,

THE WISE FIRM LLC

Dated: December 30, 2014

By: */s/ Brandon M. Wise*
Brandon M. Wise – MO Bar No. 67242
5215 Kingwood Drive
St. Louis, MO 63123
Ph: 217-710-1403
Email: Brandon.wise@thewisefirm.com

46